

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CIVIX-DDI, LLC,                              )
                                             )
                Plaintiff,                   )
                                             )
        v.                                   )       No. 03 C 3792
                                             )
CELLCO PARTNERSHIP d/b/a                     )
VERIZON WIRELESS; EXPEDIA,                   )
INC., TRAVELSCAPE, INC., and                 )
VERIZON INFORMATION SERVICES,                )
INC.,                                        )
                                             )
                Defendants.                  )


## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff CIVIX-DDI, LLC ("Civix") filed this suit against several defendants, including

Defendant Verizon Information Services, Inc. ("VIS"), Expedia, Inc. ("Expedia"), and

Travelscape, Inc. ("Travelscape")[1] alleging infringement of various claims of U.S. Patent Nos.

6,385,622 ("the '622 patent"), 6,408,307 ("the '307 patent), 6,415,291 ("the 291 patent"),

6,339,744 ("the '744 patent"), and 6,473,692 ("the '692 patent")[2]. On March 14, 2005, the

Court conducted a *Markman* hearing during which it heard evidence and argument regarding the

construction of various claim terms in the asserted patents. The Court's construction of these

---

[1] Because Expedia and Travelscape jointly submitted proposed constructions and argument
to the Court, the Court will only refer to Expedia when collectively referring to Expedia and
Travelscape.

[2] The patents in suit are included in the record at R. 218-1; Def. Expedia's Exs. 1-5 in the
order listed above. For ease of reference the Court will cite to the patents by patent number.

1

claim terms is set forth below.

## LEGAL STANDARD

A determination of patent infringement is a two-step process in which the court first construes the claims. *Cyber Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*). In the first step, claim construction, the court interprets the patent claims that define the scope of the patentee's rights under a patent. Claim construction is a matter of law exclusively for the court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In the second step, the factfinder compares the properly construed claims to the accused device to determine, as a question of fact, whether all of the claim limitations are present in the accused device. *Cybor,* 138 F.3d at 1454.

The language of the claims is the starting point for all claim construction analysis because it frames and ultimately resolves all issues of claim interpretation. *Robotic Vision Sys., Inc. v. View Eng'g. Inc.,* 189 F.3d 1370, 1375 (Fed. Cir. 1990); *Abtox. Inc. v. Exitron Corp.,* 122 F.3d 1019, 1023 (Fed. Cir. 1997). In construing an asserted claim, the analytical focus of the construction must begin, and remain centered, on the language of the claims themselves. *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1201-02 (Fed. Cir. 2002).

In the absence of an express intent by the patentee to impart a novel meaning to a claim term, the words are presumed to take on the ordinary and customary meaning attributed to them by those of ordinary skill in the art. *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed. Cir. 2002). The court may determine the ordinary and customary meaning of a claim term by reviewing a variety of sources, beginning with the intrinsic evidence consisting of the claim

2

terms themselves, the written specification, drawings, and prosecution history. *Victronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). The court may consult dictionaries, encyclopedias and treatises to determine the ordinary meaning of a word. *Texas Digital,* 308 F.3d at 1202-03.

The ordinary and customary meaning of claim term will not govern if the intrinsic record contains clear lexicography or disavowal of claim scope. *C.R. Bard, Inc. v. United States Surgical Corp.,* 388 F.3d 858, 863 (Fed. Cir. 2004). Also, if a disputed claim term has no previous meaning to those of ordinary skill in the art, its meaning must be found elsewhere in the patent. *Novartis Pharm. Corp. v. Abbott Labs.,* 375 F.3d 1328, 1334 (Fed. Cir. 2004); *see also J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co.,* 106 F.3d 1563, 1568 (Fed. Cir. 1997) (if a term has no meaning to those of ordinary skill in the art, its meaning must be found somewhere in the patent because under 35 U.S.C. § 112, ¶ 2, an inventor must particularly point out and distinctly claim the subject matter of his invention). On one hand, a district court must be vigilant not to read limitations from a preferred embodiment into the claims themselves. *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification – even if it is the only embodiment – into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.") On the other hand, statements that "describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term. *C.R. Bard,* 388 F.3d at 864, citing *Digital Biometrics, Inc. v. Identrix, Inc.,* 149 F.3d 1335, 1347 (Fed. Cir. 1998). Further, such statements that "describe the invention as a whole are more likely to be found in certain sections of the specification, such as the

Summary of the Invention." *C.R. Bard,* 388 F.3d at 864, citing *Microsoft Corp. v. Multi-Tech Sys., Inc.,* 357 F.3d 1340, 1348 (Fed. Cir. 2004).

## BACKGROUND

Civix accuses Expedia, Travelscape, and VIS of infringing various claims from five United States patents. The accused services relate to hotel search services and car rental search services provided by Expedia and Travelscape at www.expedia.com, and other websites such as www.aa.com, and various search services provided by VIS at www.superpages.com and other websites such as www.msn.com.

According to Civix, the patents in suit relate to systems used to locate points of interest in geographical regions by accessing a remote database. The parties logically divide the five asserted patents into two categories. The first category consists of the '622, '307, and '291 patents, which the parties refer to as "the Civix Patents." These patents all derive from U.S. Patent Application No. 08/371,425. The second category consists of the '744 and '692 patents, which the parties refer to as the "Go2 Patents." Unlike the Civix Patents, the Go2 Patents did not derive from the 08/371,425 application. Instead, Civix acquired the '744 and '692 patents from Go2, one of the original Defendants in this case. The Go2 Patents derive from a chain of applications filed by other inventors, beginning with U.S. Patent Application No. 08/701,586.

## ANALYSIS

### I.     The Agreed-Upon Terms

The parties agree upon the constructions for many of the terms from the disputed claims in

the asserted patents. With the exception of the terms "remote" and "remotely,"[3] the Court adopts

the agreed-upon constructions from the Jointly Submitted Chart of Agreed Claim Terms and

Claim Terms Remaining in Dispute, filed on March 1, 2005. (R. 264-1; Jointly Submitted Chart.)

In addition, at the *Markman* hearing on March 14, 2005, the parties indicated that they also agree

upon a construction for "information controller." The Court adopts the agreed construction for

"information controller" as "one or more devices that manage the transfer of data into or out of

the database, where the information controller may be implemented as software running on the

database hardware." (*Markman* Transcript at 17:22-18:1.)

## II.     The Disputed Terms

In the Civix Patents, the parties dispute the construction of the terms "spatial detail,"

"internet/Internet," and "remote/remotely." The term "spatial detail" appears in claims 13 and 42

of the '662 patent, claims 1, 6, and 22 of the '307 patent, and claims 1, 5, 7, 14, 21, and 23 of the

'291 patent. The term "Internet" appears in claims 6, 12, 20, 23, 26, 29, 38, 61, and 63 of the

'622 patent, and claims 1 and 14 of the '291 patent. The term "internet" appears in claim 6 of the

'307 patent. The terms "remote" or "remotely" appear in every independent claim of the Civix

Patents.[4]

In the Go2 Patents, the parties dispute the construction of the terms "ULA," "PLA," and

"locational address is defined based on a latitude/longitude." The terms "ULA" and "PLA" are

not terms present in any of the asserted claims of the Go2 Patents. The parties have agreed,

---

[3]The Court discusses the construction of "remote" and "remotely" in Section V of this
Analysis.

[4]Not all of the claims listed are actually asserted by Civix in this action.

however, that the claim term "locational address" is either a "ULA" or a "PLA" and that those are unique and specially defined terms. The parties have agreed that the meaning of those terms will assist the trier of fact. The "locational address" limitation appears in claims 27, 28, 41, and 42 of the '692 patent, and claims 1, 2, 8, and 9 of the '744 patent. The term "locational address is defined based on a latitude/longitude" appears in claims 27 and 41 of the '692 patent.

## III.     The Term "spatial detail"

The Court first turns to the term "spatial detail."

### A.     The Parties' Proposed Constructions

Civix proposes construing "spatial detail" as "geographic information represented in two or three dimensional space."[5] Expedia initially proposed that the Court should construe the term to mean "[p]articular data relating to the position in an area or region." At the *Markman* hearing, however, Expedia agreed to the construction of "spatial detail" as "particular data relating to an area or region." VIS initially proposed construing "spatial detail" to mean "[d]ata relating to position." At the *Markman* hearing, however, VIS agreed to "geographic information relating to position."[6]

### B.     The Parties' Proposed Dictionary Definitions for "Spatial Detail"

In support of its position, Expedia cites to *Webster's 3rd New Int'l Dictionary* ("*Webster's*

---

[5]In its initial briefing, Civix proposed that the Court should construe the term "spatial detail" to mean "[m]ap, street and landmark information represented in two or three dimensional space." In its Reply Brief, Civix indicated that it would agree that the language "map, street, and landmark information" and that the Court should instead adopt the language "geographic information."

[6]VIS also noted in its Response Brief that it could accept a construction of "spatial detail" that includes both the concept of multiple dimensions and the concept of a position within a multi-dimensional area. (R. 231-1; VIS Resp. Br. at 3.)

6

*3rd*"), defining the term "spatial" as "of or relating to space." (R. 218-1; Fogel Decl. at Ex. 19.)

Expedia then relies on the *Webster's 3rd* definition of "space" as "an extent or area set apart or available for a particular purpose" or a "three dimensional region." (*Id.* Ex. 20.) Incorporating the definition of "space" into the definition of "spatial," Expedia proposes that "spatial" means "something that relates to an area or region." Expedia relies on *Webster's 3rd's* definition of "detail" as "extended treatment of or attention to particular items" or a "particularized account." (*Id.* Ex. 21.) Morphing these dictionary definitions together, Expedia proposes that the Court should construe "spatial detail" as "particular data about an area or region."

VIS follows a similar, but not identical analysis. VIS agrees with Expedia that "spatial" means "of or relating to space." VIS then argues that the type of "space" to which the Civix Patents relate is positions of items of interest. Therefore, VIS contends that "spatial detail" means "data relating to position."

Civix, on the other hand, points to the Glossary of GIS Technology ("GIS Glossary") defining "spatial" as "phenomena distributed in two or three dimensional space and therefore having physical dimensions." (R. 215-1; Pl.'s Ex. P.) Although Civix does not expressly make this argument, Civix apparently contends that because the GIS Glossary defines "spatial" and not "space," the detail itself, must be "spatial." Civix also challenges Defendants' reliance on a general purpose dictionary such as *Webster's 3rd* because "spatial detail" is a term of art.

## C. Construction of "Spatial Detail"

Expedia's proposed construction most closely tracks the plain and ordinary meaning of "spatial detail." Civix contends that "spatial detail" is a term of art, with a special meaning in the field of the inventions. In support of this contention, Civix cites to the definition of "spatial" in

7

the GIS Glossary. Civix, however, has failed to show that the term "spatial detail" is a term of art with a meaning different from its plain and ordinary meaning. First, the GIS Glossary does not define "spatial detail," but instead only defines "spatial." If it was the case, as Civix contends, that the phrase "spatial detail" was a term of art, then the GIS Glossary, which Civix asserts is a technical dictionary in the relevant field, would define that phrase.

Second, the definition of "spatial" set forth in the GIS Glossary actually supports the ordinary meaning of "spatial" as set forth in *Webster's 3rd* and submitted by Defendants. Civix contends that the GIS Glossary defines "spatial" as "phenomena distributed in two or three dimensional space and therefore having physical dimensions." The actual definition of "spatial," however, as set forth in the GIS Glossary, provides that something that is "spatial" "refers to phenomena distributed in two or three dimensional space and therefore having physical dimensions." The inclusion of the phrase "refers to" is important here, because that language coincides with the suffix "-ial," which typically means "of, relating to, or characterized by." (*Webster's 3rd* at 48, 1119.) Therefore, according to the GIS Glossary, "spatial detail" is detail that "refers to phenomena distributed in two or three dimensional space []." In other words, Civix's dictionary definition supports the general construction that "spatial detail" means "detail relating to space," regardless of how one defines "space."[7]

The question then becomes how the Court should construe "space" and "detail." Based on the GIS Glossary definition of "spatial," Civix would presumably construe "space" as

---

[7]While the Court recognizes that general purpose dictionaries attempting to define technical terms can often be misleading, *Vanderlande Indus. Nederland BV v. ITC,* 366 F.3d 1311, 1321 (Fed. Cir. 2004), here, the technical and general purpose dictionaries are in agreement.

"phenomena distributed in two or three dimensional space." Expedia, on the other hand, proposes "an area or region" and VIS proposes "position." The Court agrees with Expedia. Civix's proposed definition is quite similar, although would likely confuse the jury. *Retractable Techs. v. New Medical Techs.*, Nos. 4:02-CV-34, 4:03-CV-49, 2004 WL 435054, *16n.8 (E.D. Tex. Mar. 3, 2004) (the district court should adopt a construction that will assist the fact finder in making its determinations). The Civix Patents do not discuss any requirement regarding presenting information in two or three dimensional format. While Civix points the Court to Figures 2 and 12, which are certainly in two dimensional format, those Figures are also presenting areas or regions. The fact finder is much more likely to understand the terms "area or region" rather than "two or three dimensional space." Further, the concept of "two or three dimensional space" is itself ambiguous. For instance, while Civix argues that "spatial detail" does not include a one-dimensional object, the concept of such a one-dimensional object is unclear. Even a single point, for example, has two dimensions to it. The terms "area or region" are more appropriate to define "space" in the context of the Civix Patents which even Civix agrees relate to "locating points of interest in geographical regions." (Civix Benchbook at 6.)

Moreover, the intrinsic record contradicts Civix's proposed construction. In the prosecution history of the '307 patent, where the inventor stated to the examiner, "[f]inally, claim 38 is amended as suggested by the Examiner, to include 'spatial detail' (e.g., a map or latitude/longitude position) within the database." (R. 215-1; Pl.'s Ex. B at C00612.) Here, the applicant plainly identified a "latitude/longitude position" as an example of spatial detail. As Defendants argue, a latitude/longitude position is a precise location, and is not two or three-dimensional in the way that Civix is using those terms. Civix counters by arguing that the Patent

9

Examiner explicitly rejected latitude/longitude coordinates alone as anticipated by the prior art. It further argues that if "spatial detail" includes a latitude/longitude coordinate pair, the claims would have been rejected under 35 U.S.C. § 102 as anticipated by the Nobe reference. Civix, however, misstates the prosecution history of the '307 patent. During prosecution, to overcome the Examiner's rejection over the Nobe reference, the applicant amended the claims both to include the reference to "spatial detail" and to require that the database providing the "spatial detail" was remote from the port location. (*Id.* at C00587, 00614, 00626.) In allowing the patent claims to issue, the Examiner explained that, "[t]he claim is allowed as being unique combination (sic) of elements as recited. The notable distinction over the prior art of record is that the database that is providing the spatial details for the items of interest is <u>not</u> located at the second location where the retrieving port is located." (*Id.* at C00625-626.) In other words, the Examiner was not saying that "spatial detail" as claimed in the Go2 Patents was something that was not taught in the prior art, but rather that the combination of providing the "spatial detail" from a database remote from the port was something different from the prior art. In fact, the Examiner expressly acknowledged that "spatial detail" was taught in the prior art: "The prior art of record, as discussed in length in the interview dated October 17, 2001, teaches the retrieval of spatial item of interest, however, does not teach the fetching of the item from a remote database as claimed." (*Id.* at C00625-626.) Civix's effort to distinguish "spatial detail" from one-dimensional information present in the prior art is simply not convincing.

The specification of the Civix Patents also contradicts Civix's position that "spatial detail" must be represented in two or three dimensions. In the Summary of Invention, the Civix Patents provide that:

10

> Preferably, the geographic vicinity includes certain spatial detail of the items of interest. For example, the geographic vicinity can include a map of the items of interest in the selected category, as well as street and landmark information displayed relative to the user's position at the remote port.

('622 Patent, col. 2, ll. 45-50.) Therefore, the specification provides two examples of "spatial detail." The first example is a map of the items of interest in the selected category. The second example is street and landmark information displayed relative to the user's position at the remote port. Civix argues that streets and landmarks are two- or three-dimensional, and therefore support its proposed construction. The language in the specification, however, provides "street and landmark information" as an example of "spatial detail." The specific reference to "information" demonstrates that "spatial detail" is not necessarily limited to two- or three-dimensional representations.

The Court also rejects VIS's proposal that "space," in the context of the Civix Patents means "position." VIS's principle argument in support of this construction is that all examples of "spatial detail" in the Civix Patents' specification relate to "position." While a patentee's choice of examples "can shed light on the intended scope of the claim, [] a patent claim term is not limited merely because the embodiments in the specification all contain a particular feature." *C.R. Bard,* 388 F.3d at 865, citing *Liebel-Flarsheim,* 358 F.3d at 907-08. Also, reviewing the manner in which the inventors used the term "spatial detail" in the claims reveals that it would be redundant for "spatial detail" to require data about "position." According to the plain language of claims 1 and 14 of the '291 patent, "spatial detail" must be something that can define a geographic position and one can include in information about the items of interest in a database. It would be redundant to restrict "spatial detail" to data about "position" if the claim language is requiring that

11

the "spatial detail" define a geographic position.

The Court now addresses the construction of "detail." Civix proposes to use the phrase "geographic information," and the Court agrees. Expedia proposes the phrase "particular data" and VIS suggests simply "data," although it will agree with "geographic information." The phrases "particular data" and "data" are overly broad in the context of the patents in suit. As discussed above, the "detail" must be of or relating to an area or region. Therefore, based on the plain and ordinary meaning of the claim term "spatial detail," the detail must be "geographic information" in order to have any clear meaning to a trier of fact. The intrinsic record supports this understanding because each example of "spatial detail" provided in either the specification or the prosecution history involves "geographic information," not just "particular data." (R. 215-1; Pl.'s Ex. B. at C00612; '622 Patent, col. 2, ll. 45-53, Figs. 2, 12.) Expedia points to no support for "spatial detail" constituting any type of information or data other than "geographic information." As noted above, a claim term is not limited to the only embodiments disclosed in the specification. *Liebel-Flarsheim,* 358 F.3d at 907-08. Here, however, there is no evidence that one of ordinary skill in the art would understand "spatial detail" to include any type of information other than "geographic information," which is also what the plain and ordinary meaning of "spatial detail requires.

Accordingly, the Court construes "spatial detail" as "geographic information relating to an area or region."

**IV.    The Terms "Internet" and "internet"**

The Court next turns to the terms "Internet" and "internet" from the Civix Patents.

## A.    The Parties' Proposed Constructions

The parties agree that the Court should construe "internet" as "a group of networks that have been connected by means of a common communications protocol." The Court will adopt this construction. The parties disagree, however, on the construction of the term "Internet." In its briefing[8], Civix argues that a distinction exists between "internet" and "Internet." Civix proposes that "Internet" means "[a] wide area network connecting thousands of disparate networks in industry, education, government and research, using TCP/IP as the standard for transmitting information." Defendants, however, argue that both "internet" and "Internet" have the same construction.

## B.    The Terms "Internet" and "internet" have Different Meanings in the Context of the Civix Patents

The parties both rely on technical dictionaries in support of their proposed constructions. Civix cites to the IBM Dictionary of Computing (McGraw-Hill 1995) ("IBM Dictionary"), and Defendants rely on Que's Computer & Internet Dictionary (6th Edition, 1995) ("Que's Dictionary"). Both of these technical dictionaries draw a distinction between "internet" and

---

[8]Civix's position regarding whether "Internet" and "internet" have different meanings has been inconsistent. In the Jointly Submitted Chart of March 1, 2005, Civix plainly stated that "CIVIX believes that there is a distinction between "internet' and "Internet." (R. 264-1; Jointly Submitted Chart at 3.) At the *Markman* hearing, Civix appeared to adopt a new position. (Civix Bench Book at 17; *Markman* Transcript at 30:2-13.) After multiple submissions of initial claim charts between March and June 2004 (R. 74-1; Joint Claim Chart; R. 126-1; Joint Claim Chart; 129-1; Supplemental Joint Claim Chart) and three rounds of briefing, the parties submitted a Jointly Submitted Claim Chart on March 1, 2005 setting forth their final claim construction positions. (R. 264-1; Jointly Submitted Chart.) After such an extensive process, a party must seek leave of Court in order to expressly change its claim construction position. Civix has failed to do so, nor has it specifically indicated to the Court that it intends to do so. In light of this, the Court understands Civix's position regarding the construction of "internet" and "Internet" to be as it set forth in the Jointly Submitted Chart. (R. 264-1; Jointly Submitted Chart at 3.)

13

"Internet." The IBM dictionary defines "internet" as "[a] collection of packet-switching networks that are physically interconnected by Internet Protocol (IP) gateways. These networks use protocols that allow them to function as a large, composite network." (Civix Bench Book at IBM Dictionary p.354.) That same dictionary defines "Internet" as "[a] wide area network connecting thousands of disparate networks in industry, education, government, and research. The Internet network uses TCP/IP as the standard for transmitting information." (*Id.*) The Que's Dictionary defines "internet" as "[a] group of local area networks (LANS) that have been connected by means of a common communications protocol. Note the small "i" – many internets exist besides the *Internet,* including many TCP/IP based networks that are not linked to the Internet (the Defense Data Network is a case in point)." (R. 224-1; Levine Decl. at Ex. 18.) The Que's Dictionary then defines "Internet" as "[a] system of linked computer networks, worldwide in scope, that facilitates data communication services such as remote login, file transfer, electronic mail, and newsgroups. The Internet is a way of connecting existing computer networks that greatly extends the reach of each participating system."[9] (*Id.*)

Accordingly, around the time of the invention, "internet" and "Internet," had different plain and ordinary meanings. Indeed, because some claims use "Internet," and claim 6 of the '307 patent uses the term "internet," the Court presumes that the two terms have different meanings. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. K.G.,* 224 F.3d 1308, 1317 (Fed.

---

[9]The Que's Dictionary goes on to state: "The Internet, in its first incarnation as the ARPAnet, was designed to serve military institutions, yet its technology allows virtually any sytem to link to it via an electronic gateway. In this way, thousands of corporate computer systems, as well as for-profit electronic mail systems such as MCI and CompuServe, have become part of the Internet. With more than 2 million host computers serving an estimated 20 million users, the Internet is exploding at the rate of a million new users each month." (R. 224-1; Levine Decl. at Ex. 18.)

Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings.")[10]

## C. The Construction of the Term "Internet"

The primary dispute regarding the term "Internet" centers around whether the "Internet" requires TCP/IP protocol. Although the definition in the IBM Dictionary suggests that it does require TCP/IP protocol, the specification of the Civix Patents specifically mentions using protocols such as "SLIP, PPP, and TC/ICP [sic]"[11] at the server in order to allow for multi-media presentations. ('622 Patent, col. 14, ll. 20-39.) The specification contemplates using protocols other than TCP/IP.[12]

"The Internet Directory," a 1994 book that William Semple purchased shortly prior to the time of his invention, also suggests that the "Internet" does not require only a TCP/IP protocol. (*Markman* Transcript at 68:12-22, 117:21-118:14; Semple Dep. Ex. 30.) "The Internet Directory" indicates that "any computer that can take advantage of inter-network e-mail is at least partially on the Internet." (*Id.* at 117:21-118:14; Semple Dep. Ex. 30.) The book defines Internet

---

[10]The Court recognizes that this general rule of claim construction begs the question whether the terms "internet" and "Internet" are different terms in the first place. Technical dictionaries cited by both parties, however, indicate that the terms had different meanings to those of ordinary skill in the art at the time of the invention. Therefore, because the claims of the Civix Patents use both "internet" and "Internet" in various claims, this implies that one of ordinary skill in the art would understand that those terms were being used to denote different claim scopes.

[11]Defendants stated that the "TC/ICP" reference was likely a typographical error and was intended to read "TCP/IP." The Court agrees.

[12]The Court recognizes that this section of the specification is not limited to an embodiment of the invention using the Internet. Therefore, the recitation of protocols other than TCP/IP, by itself, is not conclusive of whether a particular network connection can constitute the Internet without using TCP/IP.

as "the collection of information services available on the interconnected computer networks that span the globe." Although, the book explains that there is not "a single answer to the [] question of what it means to be on the Internet" nor is there an answer to the question of what is the Internet. *Id.* The book recognizes, however, that whether or not one is on the Internet typically depends on "what kind of data transport protocol a computer uses to communicate with other computers, the one called 'TCP/IP' being what definitely puts you on the Internet." *Id.* Therefore, based on a book that one of the inventors turned to around the time of the invention, the Internet will typically utilize TCP/IP, although it does not have to.[13]

Further, between the parties' extensive briefing and additional exhibits provided at oral argument, the Court has reviewed multiple definitions of the term "Internet" from publications available to one of ordinary skill in the art around the time of the invention, including the book "How Computers Work (2d. Edition) by Ron White, describing the "Internet" as "a network of networks" but not limiting the Internet to TCP/IP. Only one of these publications includes a definition that limits the Internet to the use of TCP/IP.[14] Nonetheless, it is clear from this

---

[13]VIS cites to a publication from the Internet Architecture Board from February 1997, indicating that multiple protocols are available for the Internet. The Court notes, however, that this alone does not lead to the conclusion that TCP/IP is not always used with the Internet because different protocols can be used with one another.

[14]The Court also notes that the Federal Networking Council issued a resolution on October 24, 1995, offering its definition of the term "Internet." (FNC Resolution: Definition of "Internet," October 24, 1995, http://www.itrd.gov/fnc/Internet_res.html.) That definition provides that:
"Internet" refers to the global information system that –
(i) is logically linked together by a globally unique address space based on the Internet Protocol (IP) or its subsequent extension/follow-ons;
(ii) is able to support communications using the Transmission Control Protocol/Internet Protocol (TCP/IP) suite or its subsequent extensions/follow-ons, and/or other IP-compatible protocols; and

literature that the "Internet" is typically associated with using TCP/IP as a standard, even though it is not exclusive. (*Markman* Transcript at 117:21-118:14; Semple Dep. Ex. 30.) Even the definition of "internet" in Que's Dictionary implies that the "Internet" is associated with using TCP/IP. (R. 224-1; Levine Decl. at Ex. 18.) Accordingly, in order to assist the fact finder in determining whether a particular group of networks constitutes the "Internet," the construction of "Internet" should provide that TCP/IP is the standard typically associated with the Internet.

Finally, the numerous definitions of Internet discussed above, all refer to the Internet as worldwide, or global in some way. This distinction is material to differentiating the Internet from a potentially smaller collection of networks constituting an internet. Therefore, the Court construes "Internet" as "a system of linked computer networks, worldwide in scope, that typically is associated with using TCP/IP as a standard protocol."[15]

## V.    The Terms "remote" and "remotely"

Although the parties agreed that the terms "remote" and "remotely" mean "separated by an interval or a distance" they disagree over the meaning of "separated." While Civix contends

---

(iii) provides, uses or makes accessible, either publicly or privately, high level services layered on the communications and related infrastructure described herein. (*Id.*) Therefore, paragraph (ii) of this resolution provides that a system that was able to support communications using another IP-compatible protocol, besides TCP-IP, could still qualify as the Internet.

[15]Civix spends much effort arguing that the "Internet" cannot cover a LAN because the inventors disavowed a LAN in the specification. First, the Court addresses this same argument below in Section V regarding "remote" and "remotely." The portion of the specification relied on by Civix to support this alleged disavowal of a "LAN" does not represent "words of manifest exclusion or restriction of [] claim scope." *Gemstar-TV Guide Int'l, Inc. v. ITC,* 383 F.3d 1352, 1364 (Fed. Cir. 2004). Second, and more importantly, Defendants do not contend that their construction of either "Internet" or "internet" covers a single LAN. Instead, their proposed construction plainly requires multiple networks.

that the term "separated," as used in the agreed construction, means that "the port is not connected to the database by a network cable and ,therefore, does not include local area networks," ("LAN"). Defendants argue that the term "separated" means "to be set or kept apart."

## A.    The Court Must Construe the Terms "remote" and "remotely"

Because the construction of the terms "remote" and "remotely" is still in dispute at this point, the Court must construe those terms. The state of the law is clear – claim construction is an issue of law for the Court to decide. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996). Civix attempts to frame the dispute as requiring the Court to construe a word, "separated," that is only found in the proposed construction of a claim term, but is not, itself, part of the claim language. Taken to the extreme, as Civix argues, the Court would need to render a construction on every word used to construe the actual claim language, and the process would be endless. The Court recognizes that the *Markman* process typically results in the Court defining certain words from patent claims with other, presumably more common, and non-technical words, that the jury then compares with either the accused products or the prior art. In other words, at some point, the Court must leave the language of its claim construction up to the fact finder to comprehend. In this case, however, the parties have a finite and well-defined dispute over the meaning of what they thought was an agreed construction. In reality, the parties have not agreed upon a construction of the terms "remote" and "remotely" that the Court can present to the trier of fact in a way that satisfies the

18

law under *Markman*.[16]

## B.    Construction of the Terms "Remote" and "Remotely"

Defendants argue that the terms "remote" and "remotely" should have their plain and

ordinary meaning, as set forth in *Webster's 3rd*. The Court agrees and construes the terms

"remote" and "remotely" to mean "separated by an interval or distance" with "separated" meaning

"to be set or kept apart."

Civix first argues that the terms "remote" and "remotely" are defined in the Summary of

Invention portion of the Civix Patents:

> "Port," "remote access port," "terminal," or "remote access terminal" are used
> interchangeably to denote a terminal, e.g., a personal computer with modem, from
> which a user of the invention can access the database storing the information about
> the items of interest. "Remote database" or "database" are used herein to denote a
> database, e.g., a client server, which stores information for access by a user of the
> invention from a port.

('622 Patent, col. 1, l.64 - col. 2, l.5.) This language, however, is not an express definition of the

term "remote." This language does not demonstrate that the inventor is acting as his own

lexicographer. *Texas Digital Sys.*, 308 F.3d at 1204 (in order to act as his or her own

lexicographer and overcome the presumption in favor of a plain and ordinary meaning, a patentee

must clearly set forth an explicit definition of the term different from its ordinary meaning).

Further, Civix relies on the examples provided in this language following the abbreviation, e.g.

The abbreviation, e.g., however, means "for example," and therefore this language is not

---

[16]In particular, it is clear from Civix's arguments in opposition to Defendants' Motion for
Leave to File a Sur-reply, that if the "separated" issue was sent to the fact finder, that Civix would
make arguments about the meaning of that word based on Civix's alleged disavowal of claim
scope in the specification of the Civix Patents. This is the type of analysis that the parties must
present for the Court to decide as a matter of law.

limiting.[17] Also, Civix does not explain how, even if the definitions of "remote port" and "remote database" were limited to the examples provided, these definitions would necessarily exclude a connection over a LAN or require the Court to depart from the plain and ordinary meaning of those terms.

Civix next argues that the Inventor disavowed LANs in its specification. In support of this alleged disavowal Civix points to the portion of the Civix Patents' specification stating "it is generally impractical to "hard-wire" each remote access port 16 to the database 12." ('622 Patent, col. 5, ll. 64-65.) This language, however, does not represent "words of manifest exclusion or restriction of [] claim scope." *Gemstar-TV Guide Int'l, Inc. v. ITC,* 383 F.3d 1352, 1364 (Fed. Cir. 2004). Civix does not sufficiently explain how a remote access port "hard-wired" to a database equates to a LAN. On the other hand, Defendants submit evidence that one of ordinary skill in the art at the time of the invention would have understood "hard-wire" to mean "to connect equipment [] permanently," and would have understood that with LANs, computers are not permanently connected. (R. 218-1; Fogel Decl. Ex. 33 at 17, Ex. 36.) Civix does not rebut this argument. In fact, Defendants point to language in the Civix Patents' specification demonstrating that LANs may be a type of communication link included within the scope of the Civix Patent claims. Namely, the Civix Patents include coaxial cable as an example of a communication link that one could use to connect a database and a "remote" port. Defendants submit evidence that one of ordinary skill in the art around the time of the invention would have known that LANs used coaxial cable. This is further evidence that a database and port connected via a LAN may still be "remote" to each other.

---

[17]*See* Bryan A. Garner, Black's Law Dictionary, p.533 (7th ed. 1999).

20

## VI.    The Term "ULA"

The disputed term "ULA"[18] stands for "universal locational address."  ('744 Patent, col. 3,

l. 4.)  All parties agree that the term "ULA" does not have an ordinary and customary meaning to

a person of skill in the art, apart from the specification of the Go2 Patents.  The parties also agree

that the inventors intended to be their own lexicographers by defining the term "ULA" in the

patent specification.  The dispute is over what portions of the specification define the term

"ULA."  The Summary of Invention in the Go2 Patents provides:

> a universal location address is defined by subdividing a geographic location into
> several independent districts, each with a name and a reference point.  The
> reference point has a known locational address within a global referencing system.
> A coordinate system is placed on the district relative to the reference point,
> yielding a position indicator for locations within a district.  Combining the district
> name and the position indicator defines the local location.

('744 Patent, col. 2, ll. 10-19.)  At the *Markman* hearing, the Court questioned each party

whether they could accept a construction of "ULA" that recited this definition.  Although Civix

initially agreed with this construction, it subsequently proposed limiting the construction to the

first sentence.  While Defendants indicated that they agreed with this construction they stressed

the importance of requiring that one use a local referencing system to define a location.

### A.    The Construction of "ULA"

The Court construes the term "ULA," as set forth completely in the Summary of Invention

('744 Patent, col. 2, ll. 10-19).  Civix's attempt to limit the construction to the first sentence fails.

---

[18]Although the term "ULA" does not appear in any asserted claim in this case, the parties
have agreed that the "locational address" limitation of the Go2 Patents is either a "ULA" or a
"PLA."  The parties also agree that the meaning of those terms will assist the fact finder.  The
"locational address" limitation appears in claims 27, 28, 41, and 42 of the '692 patent and claims
1, 2, 8, and 9 of the '744 patent.

Civix appears to contend that the additional sentences in the Summary of Invention defining a "ULA" are unnecessary because a "ULA" does not require a local referencing system. Instead, Civix contends that a "ULA" with a local referencing system is merely one embodiment of a "ULA." Because the paragraph defining a "ULA" appears in the Summary of Invention, however, it is likely that this language relates to the invention as a whole, and not just a referred embodiment of that invention. *C.R. Bard,* 388 F.3d 858.

Furthermore, none of Civix's citations to the specification teach a "ULA" that does not have a local referencing system. At column 4, lines 31-33, the specification states, "[t]hose skilled in the art will recognize several other alternative ways to define a grid system." ('744 patent, col. 4, ll. 31-33.) While this language indicates there may be alternative ways to define a grid system (or a local referencing system), it says nothing about using a "ULA" without any such grid, or local referencing, system.

Civix also points to column 4, lines 54-56, stating "[t]hose skilled in the art will recognize several alternatives to this approach." ('744 patent, col. 4, ll. 54-56.) This language appears in the closing sentence to a paragraph discussing using hierarchical grids to improve the resolution of a locational address. It says nothing about whether one can use a "ULA" without a local referencing system. Civix next points to column 3, lines 17-19 stating that "[e]ach city may have a reference point..." ('744 Patent, col. 3, ll. 17-19.) Civix contends that this permissive language indicates that a ULA does not have to have a reference point.[19] A review of the specification of the Go2 patents, however, shows that this statement is referring to the preferred embodiment

---

[19]The Court notes that if Civix was correct and this permissive language did indicate that a reference point, not just local coordinate system, was option, then this would contradict even Civix's proposed construction, which requires a reference point for each district.

22

where "districts are chosen relative to cities." ('744 Patent, col. 3, l. 15.) In other words, because districts "may" be cities, it is true that "each city may have a reference point." This language, though, does nothing to contradict the definition of "ULA" in the Summary of Invention stating that "each [district has] a name and a reference point" and that a "coordinate system is placed on the district relative to the reference point, yielding a position indicator for locations within the district." ('744 Patent, col. 2, ll. 13-16.)

Civix also points to column 9, lines 11-13, stating that "[t]his optional code is at a fourth or fifth level." ('744 Patent, col. 9, ll. 11-13.) This language appears under a sub-heading "City Grid" in Example 1 provided in the specification. While this language indicates that it may be "optional" to use a particular code related to a "city grid," it says nothing about using a "ULA" without a local referencing system. Indeed, the patent explains Example 1 as demonstrating the use of "Hierarchical Identifiers []and a purely numeric ULA grid referencing system." ('744 Patent, col. 8, ll. 15-20.) In other words, the "optional code" may or may not be included in the identifier for a location. This does not mean that the city grid is not in place. Nor does this mean that one does not use a local referencing system. The language in the specification pointed to by Civix does not demonstrate that one can use "ULA" without a local referencing system.

Civix also argues that a construction of "ULA" that requires a local referencing system would exclude preferred embodiments shown in Figures 6, 7 and 12a-c. Regarding Figures 6 and 7, the specification indicates that one uses a local referencing system with a "ULA" in both of those figures. The only example of a "ULA" in either of the maps in Figure 6 or 7, is provided as CA.YSM.32.84.23.43. ('744 Patent, Col. 13, ll. 42.) As explained in the specification, the numbers 32.84.23.43, are references to a specific location on a local referencing system.

Therefore Figures 6 and 7 demonstrate the use of a local referencing system for a "ULA."

Regarding Figures 12a-12c, the specification plainly explains that only 12a uses a "ULA," whereas 12b and 12c show the use of a PLA. ('744 Patent, col. 14, ll.35-54.) Referring to Figure 12a, the patent shows the "ULA" as "US TX AUS 55.63.17.62." As discussed above, as explained in the specification, the numbers "55.63.17.62" refer to a specific location on a local referencing system. Therefore, Civix does not point to any embodiment in the Go2 specification that shows a "ULA" without using a local referencing system. Accordingly, Civix has not demonstrated any basis in the intrinsic evidence for only partially adopting the definition of "ULA" provided in the Summary of Invention.

The Court also rejects Defendants' attempts to incorporate further language into the plain definition from the Summary of Invention. While the specification discusses various embodiments of a "ULA," the Summary of Invention defines a "ULA" by describing the features of forming a "ULA" that are required for an address to constitute a "ULA."[20]

## VII. The Term "PLA"

The term "PLA"[21] stands for proprietary locational address. ('744 Patent, col. 3, l. 5.) Similar to the term "ULA," the parties agree that the term "PLA" does not have an ordinary and

---

[20]The Court notes that in the parties' briefing the parties appeared to also dispute whether the ULA was displayed as a "character string" or a "unique combination of alpha, numeric or alphanumeric characters." In light of the parties' agreement to the language from the Summary of Invention, the Court determines that the express definition in the Summary of Invention resolves the parties' dispute.

[21]As with "ULA," although the term "PLA" does not appear in any asserted claim in this case, the parties have agreed that the "locational address" limitation of the Go2 Patents is either a "ULA" or a "PLA." The parties also agree that the meaning of those terms will assist the fact finder. The "locational address" limitation appears in claims 27, 28, 41, and 42 of the '692 patent and claims 1, 2, 8, and 9 of the '744 patent.

customary meaning to a person of skill in the art, apart from the specification of the Go2 Patents. The Summary of Invention defines "PLA" as:

> A proprietary address is a name, which will be unique within the district, that distinctly identifies a location with the district. A proprietary address is created by selecting a name, capturing positional information about the location associated with the name, checking that the name is unique in the district and storing the name with its associated locational information and feature data. Once stored, the name and the associated information may be selectively disseminated to users of locational systems.

('744 Patent, col. 2, ll. 22-31.) At the *Markman* hearing, the parties agreed that the Court can construe the term "PLA" according to this language. After initially agreeing, however, Civix again argued that the Court need only adopt the first sentence of this definition. For the reasons discussed below, the Court rejects this position and adopts the entire definition.

## A.    The Construction of "PLA"

First, as discussed above with respect to "ULA,[22]" while the Court is careful not to read limitations from a preferred embodiment into the claims, language that is in the Summary of the Invention section of a specification is more likely to apply to the invention as a whole, rather than a particular embodiment. *See C.R. Bard,* 388 F.3d at 864. In this case, unlike in *C.R. Bard,* there is no plain and ordinary meaning of the term "PLA." Therefore, the reasons for adopting a plain definition set forth in the Summary of Invention are even more compelling because the Court need

---

[22]The Court notes that the nature of the definition in the Summary of Invention for the term "PLA" is somewhat different than for "ULA." The patent defines "ULA" based on how one derives or creates that address. For "PLA," however, the first sentence defines what a "PLA" represents, and the rest of the definition references how one creates that PLA. At the *Markman* hearing, Mr. Hancock, one of the inventors named on the Go2 Patents explained that the "PLA" definition begins with the requirement of associating an address with a location because one needed to understand this concept before understanding the process of forming the "PLA." (*Markman* Transcript at 174:1-3.)

25

not worry about incorporating a limitation from the specification into an otherwise broadly interpreted claim term.

Second, Civix argues that the specification of the Go2 patents makes clear that the claims are not limited to the precise embodiments described. Civix cites to column 17, lines 62-67 of the specification stating that:

> While embodiments and applications of this invention have been shown and described, it would be apparent to those in the field that many more modifications are possible without departing from the inventive concepts herein. The invention, therefore, is not to be restricted except in the spirit of the appended claims.

('744 Patent, col. 17, ll. 62-67.) Claims are not limited to only those embodiments disclosed in the specification. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1373 (Fed. Cir. 2003). In this situation, however, the parties agree that the term "PLA" has no meaning to one of ordinary skill in the art and that the patentee intended to define the term in the specification. The language at the end of the specification[23], to which Civix cites, is not specific enough for the Court to depart from the definition provided in the Summary of Invention. In particular, that language does not indicate that one could use a PLA in the context of the claimed invention without capturing positional information. ('744 Patent, col. 2, ll. 25.)

---

[23]Indeed, the language referenced by Civix appears to be the kind of boilerplate language utilized by most patent attorneys in concluding a patent specification. As is well known in the law, a patentee must provide an enabling disclosure commensurate with the scope of the claims. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004). Therefore, the relevant inquiry is not whether the patentee states that other embodiments may exist, but instead, what other embodiments were known to one of skill in the art based on the patent's disclosure. *Id.* at 1254. Here, Civix does not argue, or set forth any evidence to show, that one of skill in the art would know to use PLA's in the context of the claimed invention, without the requirements set forth in the portion of the definition it asks the Court to ignore.

## VIII. The Term "locational address is defined based on a latitude/longitude"

The next disputed term in the Go2 Patents in "locational address is defined on a latitude/longitude."

### A. The Parties' Proposed Constructions

Civix proposes that this term means "[t]he locational address has a defined relationship with a global latitude/longitude coordinate system." Defendants propose that this term means "[t]he locational address is derived from a latitude/longitude coordinate pair of a global latitude/longitude coordinate system."

### B. The Construction of "locational address is defined on a latitude/longitude"

The Court agrees for the most part with Civix's proposed construction. Defendants' proposed construction strays too far from the plain language of the claim. Most importantly, Defendants seek to include the phrase "*derived* from a latitude/longitude coordinate pair of a global latitude/longitude coordinate system" (emphasis added) to construe the phrase "defined based on a latitude/longitude." The Go2 Patents, however, used the term "derived" in other claims, such as claim 20 of the '744 patent stating that "said second locational address is derived from information manually inputted by said user." Therefore, the Court presumes that a claim term requiring that one "derive" a locational address from certain information is different in scope that a claim term requiring that one "define" a locational address by certain information. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different

terms in the claims connotes different meanings.")[24]

Defendants argue that there must be a "conversion" requirement built into this claim term because the parties agree that a "locational address" is either a "ULA" or a "PLA," and each of those terms requires conversion. The parties have agreed that "locational address" is either a "ULA" or a "PLA," and the Court has already construed "ULA" and "PLA." Accordingly, the Court declines to include any further limitations regarding the formation of the address beyond those already included in the definitions of "ULA" and "PLA." To assist the finder of fact, the Court will expressly incorporate the agreed construction of "locational address" into the construction proposed by Civix. Accordingly, the term "locational address is defined based on a latitude/longitude" means "a ULA (Universal Locational Address) or a PLA (Proprietary Locational Address) that has a defined relationship with a global latitude/longitude coordinate system."

---

[24]Further, while Defendants set forth dictionary definitions of "define," none of these definitions include the term "derive."

## CONCLUSION

The Court construes the disputed terms as follows:

"spatial detail" means "geographic information relating to an area or region."

"internet" means "a group of networks that have been connected by means of a common communications protocol" and "Internet" means "a system of linked computer networks, worldwide in scope, that typically is associated with using TCP/IP as a standard protocol."

"remote" or "remotely" mean "separated by an interval or distance" with "separated" meaning "to be set or kept apart."

"ULA" means "a universal locational address, which is defined by subdividing a geographic location into several independent districts, each with a name and a reference point. The reference point has a known locational address within a global referencing system. A coordinate system is placed on the district relative to the reference point, yielding a position indicator for locations within a district. Combining the district name and the position indicator defines the local location."

"PLA" means "proprietary locational address, which is a name, which will be unique within the district, that distinctly identifies a location with the district. A proprietary address is created by selecting a name, capturing positional information about the location associated with the name, checking that the name is unique in the district and storing the name with its associated locational information and feature data. Once stored, the name and the associated information may be selectively disseminated to users of locational systems."

"locational address defined based on a latitude/longitude" means "a ULA (Universal Locational Address) or a PLA (Proprietary Locational Address) that has a defined relationship

with a global latitude/longitude coordinate system."

DATED: April 6, 2005                    ENTERED

AMY J. ST. EVE
United States District Court Judge